# STATE OF MICHIGAN

# COURT OF APPEALS

LIMA TOWNSHIP,

        Plaintiff-Appellee,

v

ERNEST K. BATESON and PAMELA E.
GOUGH-BAHASH,

        Defendants-Appellants.

UNPUBLISHED
October 11, 2018

No. 338934
Washtenaw Circuit Court
LC No. 10-000368-CZ

Before: CAVANAGH, P.J., and MARKEY and LETICA, JJ.

PER CURIAM.

In this action to abate a nuisance, defendants, Ernest K. Bateson and Pamela E. Gough-Bahash,[1] appeal by right the trial court's final order enjoining them from using the property commonly known as 8786 West Liberty Road in violation of Lima Township's zoning ordinances. On appeal, Bateson and Gough maintain that the trial court erred when it determined that their use of the property was not protected under the Right to Farm Act, MCL 286.471 *et seq*. We conclude that the trial court did not err when it determined that Bateson and Gough failed to establish that the Right to Farm Act protected their storage and use of the vehicles and equipment on the property at issue. Accordingly, we affirm.

## I. BASIC FACTS

We recited the facts underlying this litigation at some length in a previous appeal to this Court and will not repeat them here. See *Lima Twp v Bateson*, 302 Mich App 483, 485-491; 838 NW2d 898 (2013). In that appeal, we determined that the trial court erred in several respects, and remanded the case to the trial court—in relevant part—to make the necessary findings of fact for its decision to grant injunctive relief. *Id*. at 501. We also instructed the court to correct an evidentiary error by considering the testimony of an additional witness, Robert Pesko. *Id*. at 502. And we retained jurisdiction. *Id*. at 504. On remand, the trial court decided to schedule the matter for trial. Because the trial court intended to hold a trial, we determined that the issues

---

[1] Gough-Bahash and Bateson married after the start of this litigation. However, for ease of reference, we shall refer to her as Gough.

remaining on appeal were moot and dismissed the appeals.[2]  After we relinquished jurisdiction, a successor judge elected not to hold the trial.  Instead, in September 2015, the successor judge proceeded to hold an evidentiary hearing to take Pesko's testimony and then decided the issue on the record evidence with the additional testimony.[3]  The trial court entered an order stating its findings in June 2016 but did not enter its final order abating the nuisance until May 2017.  This appeal followed.

## II.  THE RIGHT TO FARM ACT

### A.  STANDARD OF REVIEW

On appeal, Bateson and Gough argue that the trial court erred when it determined that they had not proved by a preponderance of the evidence that they used and stored the vehicles and equipment at issue in the operation of a farm within the meaning of the Right to Farm Act. They also maintain that the trial court should have found that their storage and use of the vehicles and equipment complied with Generally Accepted Agricultural Management Practices (accepted agricultural practices).

This Court reviews de novo whether the trial court properly interpreted and applied the relevant statutes.  *Pransky v Falcon Group, Inc*, 311 Mich App 164, 173; 874 NW2d 367 (2015) (citation omitted).  Proceedings for abatement of a nuisance are equitable in nature and we review de novo a trial court's decision in that regard, but its findings of fact are reviewed for clear error.  *Ypsilanti Twp v Kircher*, 281 Mich App 251, 270; 761 NW2d 761 (2008).  A trial court's findings are clearly erroneous when, after reviewing the record, this Court is left with the definite and firm conviction that the trial court made a mistake.  *Loutts v Loutts*, 298 Mich App 21, 26; 826 NW2d 152 (2012).

### B.  ANALYSIS

In its original complaint, Lima Township alleged that Bateson had already been sued for violating zoning ordinances with regard to another property at 7970 West Liberty Road where he operated a business involving the commercial production and sale of topsoil and landscaping materials.  It further alleged that, after the trial court in that case ordered the barricading of that property, Bateson moved his commercial equipment and vehicles to the property involved in this case and began to operate his business from there.  It alleged that the operation of a commercial contractor's establishment or storage yard, the operation of a commercial business, and the storing and staging of the commercial trucks, equipment, and landscaping materials were not permitted uses for a lot zoned as an AG-1 District.  It concluded that the unlawful uses amounted to a nuisance and asked the trial court to abate the nuisance.  Lima Township later amended its

---

[2] See *Lima Twp v Bateson*, unpublished order of the Court of Appeals, entered January 29, 2015 (Docket Nos. 306575 and 306583).

[3] The parties did not contest the trial court's decision to proceed in this manner, and that decision is not at issue on appeal.

complaint to include allegations that Bateson and Gough were removing soils and materials from the property without obtaining a special use permit as required by its zoning ordinances.

It was undisputed that the property commonly known as 8786 West Liberty Road was zoned as an AG-1 District under Lima Township's zoning ordinance. The zoning ordinances permitted various uses, which included, in relevant part, "[a]gricultural uses and customary farm accessory buildings, including apiaries and greenhouses," "[r]oadside stands selling seasonal farm produce," "single-family dwelling," "[t]ree, sod farm," "[f]ertilizer sales, feed or seed sales," and "[s]tructures or roads for the development, protection and conservation of open space, watersheds, water, soil, forest and wildlife resources." Lima Township Zoning Ordinances (Zoning Ord), § 4.5.2, 4-11. The term "agriculture" was further defined to mean the "use of land for tilling of the soil, the raising of tree and field crops, or raising animals as a source of income." Zoning Ord, § 2.2, 2-2.

The ordinance did not permit the storage or staging of commercial vehicles and equipment for a commercial operation in a district zoned AG-1. The ordinances did allow a landowner in a district zoned AG-1 to conduct the "off premise storage of service vehicles" and permitted "[q]uarries, mineral mining, sand and gravel pits, soil removal and other extractive excavations" as special uses. Zoning Ord, § 4.5.2, 4-12. However, a landowner or occupier had to obtain a permit for those special uses. See, generally, Zoning Ord, § 3.3; see also Zoning Ord, § 5.27.2, 5-35 (requiring a permit for quarry or extractive operation). Notably, the ordinances provide that a "quarry" means any "pit, excavation or mining operation for the purpose of removal of excavated materials such as earth, topsoil, sand, aggregate, clay or stone, for sale, transportation, exchange or barter, away from the premises." Zoning Ord, § 2.2, 2-21.

In response to Lima Township's complaints, Bateson and Gough claimed that they were conducting a tree farm and nursery on the property and that all the equipment and vehicles were being used to prepare the land for the tree farm and to conduct tree farming operations. They further claimed that, to the extent that their storage and use of the equipment and vehicles were prohibited by Lima Township's zoning ordinances, those ordinances were preempted by the Right to Farm Act.

As this Court observed in the previous appeal, "a violation of a zoning ordinance constitutes a nuisance per se, and a court must order it abated." *Lima Twp*, 302 Mich App at 493, citing MCL 125.3407. However, activities falling under the purview of the Right to Farm Act cannot be barred by a local zoning ordinance. *Id.*, citing MCL 286.474(6). In order to be protected under the act, the activity alleged to be a nuisance must be a "farm" or "farm operation" within the meaning of the Right to Farm Act and must conform to accepted agricultural practices. *Id.* at 494, citing MCL 286.473(1). This Court also held that the party asserting the Right to Farm Act as a defense to an abatement action has the burden to prove by a preponderance of the evidence that the challenged condition or activity constitutes a farm or farm operation within the meaning of the act and conforms to accepted agricultural practices. *Id.* at 496.

The Right to Farm Act protects the right to engage in the *commercial* production of farm products. See *Lima Twp*, 302 Mich App at 498 (recognizing that the act protects commercial farms and farm operations). For example, a "farm" is defined under the act to be "the land,

-3-

plants, animals, structures, including ponds used for agricultural or aquacultural activities, machinery, equipment, and other appurtenances *used in the commercial production of farm products*." MCL 286.472(a) (emphasis added). Similarly, a "farm operation" is defined to mean "the operation and management of a farm or a condition or activity that occurs at any time as necessary on a farm *in connection with the commercial production, harvesting, and storage of farm products . . . .*" MCL 286.472(b). As for the storage and use of machinery, such use will constitute a farm operation if the use is "necessary for a farm"—that is, necessary for the commercial production of farm products. MCL 286.472(b)(*iii*).

As Lima Township correctly notes on appeal, the machinery and equipment must be *used* in the commercial production of farm products. It is not enough to show that the property is being used as a farm or farm operation and that the equipment or machinery is on the farm; the landowner must show that the machinery and equipment are used to further the farm operations. If the use and storage are not "necessary for a farm," MCL 286.472(b)(*iii*), the municipality may enforce its ordinances regulating the use and storage of the machinery. See *Papadelis v City of Troy*, 478 Mich 934, 934; 733 NW2d 397 (2007) (holding that the municipality could enforce its ordinances regulating the construction of a greenhouse because no part of the Right to Farm Act or accepted agricultural practices addressed the permitting, size, height, bulk, floor area, construction, and location of buildings used for greenhouses).

In the previous appeal, this Court acknowledged that Bateson and Gough claimed to be preparing the land for, and actually operating, a tree farm. The Court further recognized that trees are a farm product protected by the Right to Farm Act. *Lima Twp*, 302 Mich App at 498. However, this Court also determined that the evidence before the trial court presented a question of fact as to whether Bateson and Gough actually intended to produce trees and sell them for a profit, which was a prerequisite for commercial production, and determined that there was a question of fact as to whether the activities alleged to be a nuisance were "necessarily related to the production and sale of the trees." *Id.*

On remand, the trial court resolved those questions of fact.[4] The trial court recognized that the activities at issue were: the constant coming and going of commercial gravel haulers and other commercial vehicles to and from the property; the continuous storage of commercial equipment and vehicles on the property; and the excavation and removal of materials from the property. The court then found that Bateson and Gough had engaged in "a poorly constructed

---

[4] The trial court elected to rely on the evidence previously presented during the evidentiary hearing that spanned four days, along with the testimony taken from Pesko in September 2015. It denied Lima Township's request to expand the record to include evidence collected since the evidentiary hearings. Nevertheless, Bateson and Gough have attached exhibits to their appeal that were not before the trial court, and Lima Township argues that this Court should consider the evidence that it collected and submitted after this Court's remand. We decline to consider the additional evidence; instead, we shall review the trial court's findings of fact by considering only the record established by the trial court. See *Sherman v Sea Ray Boats, Inc*, 251 Mich App 41, 56; 649 NW2d 783 (2002).

attempt to cover for an illegal gravel pit operation." It was "persuaded" that the alleged activities were "not typically found on commercial tree growing operations." The evidence, the court related, "established that [the] removal of materials of the quantity and type occurring on Bateson and Gough's property [did] not arise from tree farming operations." It also found that the "commercial vehicles used and stored on the property [were] not the type that have any logical use in tree farming operations." On the basis of the evidence that "trucks regularly came and went from the property" and that the property was used to store "drag lines, gravel haulers, bull dozers, road graders, semi-truck trailers, and pay loaders" as well as "piles of dirt, steel, and asphalt millings," the trial court found that Bateson and Gough were "actually engaged in a gravel hauling operation."

The trial court rejected Bateson and Gough's evidence that they were engaged in a tree farm operation. The court recognized that there was evidence that they had planted trees on the front acreage of the property, but it stated that there was also evidence that the land was not suitable as a farm. It discounted the evidence that Bateson and Gough had baled some hay because there was testimony that the hay was not harvestable. The court then found that Bateson and Gough failed to meet their burden to persuade the court that they were using the property as a farm. For that reason, it indicated that it did not need to determine whether the activities at issue conformed to accepted agricultural practices.

The trial court's findings were fully supported by the record evidence. There was evidence that Bateson had been engaged in the commercial production and sale of landscaping materials and that he provided contractor services related to landscaping. Bateson testified that he was in the business of contracting and supplying landscaping materials. Gough similarly said that Bateson was in the "dirt business" and dug ponds as a sideline. After Gough purchased 8786 West Liberty Road, Bateson began moving commercial equipment and vehicles to the property.

There was photo evidence and testimony that Bateson improved the driveway, created additional access roads around the pond and to the north end of the property, dredged the pond, and created a parking area. Bateson and Gough claimed that the driveway improvements, alterations to the pond, and the creation of a parking area—characterized as the farm market area by Bateson—were necessary to prepare the property for a tree farm. But those improvements were also consistent with the use of the property as a storage and staging area for Bateson's commercial business and as an area for the commercial extraction and processing of landscaping aggregates. A neighboring farmer, Joseph Egan, testified that the use of millings on the property helped make a "hard packed base for heavy equipment" and described the road around the pond as being 100 feet wide. The scale and nature of the improvements suggested that Bateson and Gough made and used the improvements to support Bateson's commercial landscaping business rather than for establishing a tree farm or other farm operation.

The photo evidence showed that the driveway, parking area, and additional roads were all located well beyond the area where Bateson and Gough planted trees. The additional access roads also appeared to facilitate the extraction, storage, and processing of landscaping materials; they did not appear consistent with any ordinary farming practices. The size of the parking area—described by Egan as half a football field in length—was also inconsistent with the small tree farm that the property could support. It was, however, well adapted to store equipment and

vehicles for a commercial landscaping business. The improvements to the driveway also plainly aided the ingress and egress of the heavy commercial vehicles actually operating from the property. Similarly, although Bateson and Gough described the pond as an irrigation pond, Gough in effect testified that the pond was not suited to irrigate the trees planted on the front acreage. That, she explained, was why she wanted Bateson to construct another pond in the wetlands nearer to the trees that they had planted. Moreover, the removal of nutrient rich soil from the pond—and any future pond created in the wetlands—was consistent with supporting Bateson's landscaping business because it provided him with more materials for sale to the general public. Thus, although the improvements could in theory have been done to develop the property as a tree farm, the improvements were also consistent with—and perhaps better suited to—the use of the property as a staging and storage area for Bateson's landscaping business.

The equipment and vehicles actually kept on the property, when considered as a whole, also strongly suggested that Bateson and Gough were not actually using them to operate a tree farm, or any other type of farm. The number and types of vehicles and equipment were consistent with Bateson's landscaping business, but were not well suited to a small tree farm operation. Bateson pointed to the fact that some farm owners in the vicinity had one or more vehicles or pieces of equipment on their farms that were similar to his equipment and machinery. But there was no evidence at the evidentiary hearing that any farm used or stored a comparable number of vehicles and equipment so specialized for landscaping and soil extraction and blending, and did so for such a modest acreage.

There was also testimony that the numbers and types of vehicles and pieces of equipment were inconsistent with the type of farming activities claimed by Bateson and Gough. Bateson and Gough correctly note that one neighboring farmer—Howard Sias—testified that many farmers would love to have the equipment that Bateson had available to him, but they omit the fact that he clarified that purchasing such equipment was not practical for a property of that size: "We'd all like a big digger and a bulldozer, and you know. Gravel trains make great grain haulers," but a gravel train was "just too expensive for what—what we do."

The implications from the testimony and other evidence was that a farmer might be able to put some of the equipment and vehicles that Bateson stored on the property to use for farming, but that the items were not practical or well suited to farming. Instead, the testimony suggested that a reasonable farmer would hire a contractor—such as Bateson—to come to his or her farm and make the occasional landscaping improvements rather than incurring the expense of acquiring and maintaining such a large inventory of vehicles and equipment for limited use.

It was also noteworthy that the evidence showed that Bateson hired Sias to cut and bale what Bateson characterized as hay, but Sias testified that he used his own equipment to cut and bale the hay. Thus, there was evidence that Bateson did not even have the necessary equipment to cut and bale hay. Additionally, Gough admitted that they planted the trees by hand. The trial court could infer from this evidence that Bateson and Gough did not have the equipment reasonably necessary to run the type of farm they claimed to be starting but instead had equipment and vehicles that—although in theory capable of being adapted for farm use—were not actually being used to maintain a tree farm or other farm operation.

There was also testimony, photos, and logs that showed that trucks and equipment frequently traveled to and from the property. Three neighboring farmers—Egan, Kenneth Prielipp, and Dale Frey—each agreed that about 500 trucks left the property at issue over the course of the summer before the evidentiary hearing. The testimony and evidence documenting the truck traffic showed that some trucks left full and came back empty, and on other occasions came back with aggregates and dumped them on the property. Bateson and Gough maintained that these coming and goings were all in furtherance of the development of their small tree farming operation. But again, the scale of the documented comings and goings of trucks and heavy equipment strongly implied that the vehicles and equipment were being used in furtherance of Bateson's commercial landscaping business. Indeed, Gough admitted that some trucks carried materials to another property for use in Bateson's business. Gough also admitted that Bateson's employee sometimes came to the property to retrieve a vehicle and use it elsewhere. Bateson too testified that vehicles occasionally left to go to other sites and work on projects. Indeed, there was testimony that Bateson delivered aggregates to a local athletic club and performed landscaping at that site. Gough claimed that Bateson did not charge for the aggregates removed from the property at issue and transported to the athletic club—he only charged for his services and the use of the equipment—but that did not change the fact that there was direct evidence that Bateson continued to use the vehicles and equipment stored on his property to further Bateson's commercial landscaping business.

There was also testimony that a township official—Kenneth Unterbrink—followed one of Bateson's trucks after it left the property at issue. After following the truck to the expressway, the truck's driver pulled off the highway and parked at a gas station. After some time, Bateson arrived and used his vehicle to block the township official as the truck drove back to the highway. Bateson's aggressive and intimidating behavior gave rise to an inference that he was trying to hide the fact that he was using the property for purposes beyond those permitted by Lima Township. If he were using the trucks as part of protected farm operation, Bateson would have no reason to prevent the township official from observing the truck's cargo and destination.

Bateson and Gough make much of the fact that the evidence did not show that there was a substantial disturbance of the surface of the land at issue. From that and other evidence, they maintain that the trial court ignored the evidence that they did not conduct a gravel pit or quarry at the property. However, Bateson and Gough admitted at the evidentiary hearing that Bateson had extracted aggregates from the property and delivered them to other locations—albeit less than claimed by the other witnesses. Bateson testified that he removed about 1500 cubic yards from the property, which he opined was all perfectly legal. He also presented testimony by a retired engineer who calculated the total material removed from the property at about 722 yards, which, he offered, would not require even close to 500 truckloads to transport. Nevertheless, aggregates are not a farm product under the Right to Farm Act. See MCL 286.472(c) (defining farm products to be "plants and animals useful to human beings"). Thus, the extraction and delivery of aggregates are not protected activities under the Right to Farm Act, see MCL 286.473, and there was no evidence that the extraction and delivery of aggregates in any way furthered the use of their property as a tree farm or other farm.

Bateson and Gough suggested before the trial court that the extraction of aggregates from the property was permitted under Lima Township's zoning ordinances to the extent that they extracted less than 500 yards per year per lot. However, the zoning ordinances prohibit all

unauthorized extraction, removal, or processing of sand, gravel, and stone. Zoning Ord, § 5.27.2, 5-35. The zoning ordinances additionally define a "quarry" to mean an excavation or extraction or mining operation done for the purpose of removing or excavating material "such as earth, topsoil, sand, aggregate, clay, or stone, for sale, transportation, exchange or barter, away from the premises." Zoning Ord, § 2.2, 2-21. The ordinance does not permit the extraction of the identified materials up to a threshold amount; rather, it provides that the extraction of the identified materials, when done for the purpose of transporting the materials *away from the premises*, constitutes a quarry. Bateson and Gough provided testimony from which the trial court could have found that they operated a quarry when they admitted that they transported aggregates away from the premises. Bateson's opinion that he could extract up to 500 yards per year was simply not supported by the plain language of the ordinance. The ordinance provided that the removal of more than 500 "cubic yards in any calendar year shall be *deemed* a quarry operation." Zoning Ord, § 2.2, 2-21 (emphasis added). Stated another way, even if the landowner does not extract the material for sale, transportation, exchange or barter, away from the premises, his or her removal of more than 500 yards of material will automatically constitute a quarry operation that requires a special use permit. Therefore, the testimony and evidence supported the trial court's finding that Bateson and Gough operated a quarry without a permit.

This Court previously determined that there was a question of fact as to whether Bateson and Gough's storage and staging of the vehicles and equipment at issue was part of a farm or farm operation. *Lima Twp*, 302 Mich App at 498. The trial court found that their storage and staging of the equipment and vehicles were not part of a farm or farm operation. Indeed, it found that Gough and Bateson sought to portray their activities as a farm or farm operation as part of a "poorly constructed attempt to cover for an illegal gravel pit operation." Stated another way, the trial court impliedly found that Bateson and Gough fabricated a defense under the Right to Farm Act in order to evade the applicable zoning ordinances.[5] While one might disagree with the trial court's findings, there was record support for them. And we are not left with the definite and firm conviction that the trial court was incorrect. See *Loutts*, 298 Mich App at 26.

The trial court did not clearly err when it found that Bateson and Gough did not engage in the activities about which Lima Township complained as part of a farm or farm operation. See *Ypsilanti Twp*, 281 Mich App at 270. It follows then that it did not err when it determined that the Right to Farm Act did not preempt Lima Township's zoning ordinances. See *Lima Twp*, 302 Mich App at 494-496. Moreover, because the trial court did not err when it determined that Bateson and Gough failed to establish the first element of their defense under the Right to Farm Act, it did not err when it declined to consider the second element. See *id.* at 500-501.

---

[5] Gough and Bateson rely on the decision in *Brandon Twp v Tippett*, 241 Mich App 417; 616 NW2d 243 (2000), for the proposition that they could store and stage their equipment and vehicles on the property at issue consistent with the Right to Farm Act if they used the equipment and vehicles to farm on their other properties. The trial court in this case found that Bateson and Gough were not using the vehicles and equipment at issue for farming. As such, whether they would be protected by the Right to Farm Act if they were using them for farming elsewhere is irrelevant.

## III.  VEXATIOUS APPEAL

On appeal, Lima Township argues that this Court should dismiss the appeal by Bateson and Gough and sanction them for filing a vexatious proceeding.  More specifically, Lima Township maintains that this Court should sanction Bateson and Gough under MCR 7.216(C)(1), and should do so without requiring Lima Township to file a motion under MCR 7.211(C)(8).  This Court has the authority to assess actual and punitive damages for a vexatious appeal on its own initiative.  See MCR 7.216(C)(1).  However, when a party requests "damages or other disciplinary action under MCR 7.216(C)," the request must be made in a motion filed under MCR 7.211(C).  See MCR 7.211(C)(8).  "A request that is contained in any other pleading, including a brief filed under MCR 7.212, will not constitute a motion under this rule."  *Id*.  Although Lima Township has framed this issue as a request for this Court to assess actual and punitive damages on its own initiative, the request is in effect a motion for actual and punitive damages that must be made by a properly filed motion.  See *Bonkowski v Allstate Ins Co*, 281 Mich App 154, 182; 761 NW2d 784 (2008).  Because Lima Township has not filed a motion with this Court, we decline to consider the request.  See *id.*

## IV.  CONCLUSION

Bateson and Gough failed to identify any errors that warrant reversing the trial court's final order compelling them to abate the nuisance conditions and activities identified in Lima Township's amended complaint.  Accordingly, we affirm.

Affirmed.  As the prevailing party, Lima Township may tax costs.  See MCR 7.219(A).


/s/ Mark J. Cavanagh
/s/ Jane E. Markey
/s/ Anica Letica